# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| RITA J. VIAN, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:15-cv-00040-SLC** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Rita J. Vian appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be

REVERSED, and the case will be REMANDED to the Commissioner for further proceedings in

accordance with this Opinion and Order.

## I. PROCEDURAL HISTORY

Vian applied for DIB and SSI in January 2012, alleging disability as of December 9,

2011. (DE 10 Administrative Record ("AR") 253-63). The Commissioner denied Vian's

application initially and upon reconsideration. (AR 190-210). After a timely request, a hearing

was held on July 10, 2013, before Administrative Law Judge Patricia Melvin ("the ALJ"), at

which Vian, who was represented by counsel, and a vocational expert, Sharon Ringenberg (the

"VE"), testified. (AR 41-130). On June 15, 2015, the ALJ rendered an unfavorable decision to

---

[1] All parties have consented to the Magistrate Judge. (DE 13); *see* 28 U.S.C. § 636(c).

Vian, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform her past relevant work as a gas station cashier, as well as a significant number of other light work jobs in the economy, such as retail marker, cafeteria attendant, and hand packager. (AR 21-34). The Appeals Council denied Vian's request for review (AR 1-15, 351-53), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Vian filed a complaint with this Court on February 5, 2015, seeking relief from the Commissioner's final decision. (DE 1). Vian advances three arguments in this appeal: (1) that the ALJ improperly evaluated the opinion of Donna Spears, a treating advanced practice nurse; (2) that the ALJ failed to consider Vian's various medical impairments in combination when assessing her residual functional capacity ("RFC"); and (3) that the ALJ improperly discounted the credibility of her symptom testimony. (DE 18 at 11-16).

## II. FACTUAL BACKGROUND[2]

At the time of the ALJ's decision, Vian was 54 years old (AR 253), had obtained her GED and had vocational training as an H&R Block tax preparer (AR 46, 302), and possessed past work experience as a cashier (AR 302). She had worked at Meijer and Wal-mart after her alleged onset date; she left her at job at Meijer, where she had worked for more than four years, in July 2012 after missing too many days, and her job at Walmart after that amounted to an unsuccessful work attempt. (AR 23, 47-49, 509, 571, 588). Vian alleges disability due to degenerative disc disease of the cervical spine, chronic obstructive pulmonary disorder ("COPD"), emphysema, blebs, depression, and anxiety. (DE 18 at 2).

_____

[2] In the interest of brevity, this Opinion recounts only the portions of the 619-page administrative record necessary to the decision.

At the hearing, Vian, who was four feet, 11 inches tall and weighed 130 pounds, testified that she was divorced and living in an apartment with her boyfriend, who is disabled.  (AR 45-47, 51).  She is the sole caregiver for her boyfriend, who requires constant assistance, including tracheostomy care.  (AR 72; *see also* AR 509).  She is able to perform her self care independently, but had not bathed in six weeks.  (AR 84-85, 92).  Because she has pain and difficulty standing, Vian rarely cleans, has not done laundry in seven months, and does not vacuum.  (AR 56-57).  She does do dishes, although not regularly; heats up frozen meals; and takes the trash to the chute.  (AR 56-57, 86-87).  She watches television, but she used to read books and does not do so anymore.  (AR 81).

Vian testified that she has been in pain every day since being hit by a car in 2007.  (AR 53).  The pain is centered in the low part of her neck just above the shoulders and extends down to just below her shoulder blades.  (AR 54).  She rated her pain, without medication, as a "five" on a 10-point scale.  (AR 55).  When taking Percocet, her pain reduces to a "three" and she can function a lot more, although the Percocet sometimes makes her feel tired (AR 54-57); her pain is less intense when she lies flat (AR 54-55).  At the time of the hearing, she could not afford prescription pain medications, so she was simply putting up with the pain; when she had health insurance, she went to a pain management clinic and received spinal injections, which were helpful.  (AR 55-57, 70).  She stated that she was supposed to have cervical fusion surgery in July 2012, but she cancelled it because she was getting evicted and her boyfriend went on life support.  (AR 53-54).

Vian complained of having difficulty breathing after walking three to four blocks due to

her COPD and emphysema.  (AR 58, 62).  Otherwise, when at home, she becomes short of breath "[m]aybe a couple of times when [she's] doing dishes, but that's about it" (AR 60); she tries not to exert herself too much (AR 62).  She was given a nebulizer and inhalers, which are both helpful, but she ran out of medication for the nebulizer and was not using it anymore.  (AR 60-62).  She experiences no side effects from the inhalers, but the nebulizer treatments increase her heart rate.  (AR 62).

Vian reported that she has chest pains up to twice a month.  (AR 63).  She takes nitroglycerine for this symptom, which eases her discomfort in five minutes but also gives her a headache.  (AR 63, 65, 66).  She complained of having blisters on her lungs (blebs), which are painful when they pop; this pain occurs up to four times a day and worsens when she smokes.  (AR 66-68).  This pain can increase to an "eight" or "nine" at times, and she takes Neurontin for the pain.  (AR 69).  Despite her pain, Vian continues to smoke, but she had decreased her use from one pack a day to four cigarettes a day.  (AR 67, 88).

Vian also complained of depression, which worsened the previous year when she was evicted and faced homelessness.  (AR 71-72).  She had started seeing a counselor about a year earlier.  (AR 72-73).  She was taking Vistaril for anxiety and Celexa for depression, which were helpful, but she only takes Vistaril when absolutely needed because it affects her breathing.  (AR 74-75, 77).  She also complained of difficulty with concentration and focus, but stated that she has no difficulty in getting along with others.  (AR 84, 90).

Vian estimated that she could walk one-half block before becoming short of breath or experiencing pain, stand for 20 minutes, sit for 20 minutes, and lift a gallon of milk.  (AR 78-79).  Pushing or pulling with her arms causes pain in her back.  (AR 79).  She has difficulty climbing

stairs, as it increases her back pain and makes her short of breath. (AR 80). She also complained of feeling dizzy at times, which she thought might be linked to taking Celexa. (AR 81).

### B. Summary of the Relevant Medical Evidence

In April 2010, Vian visited Jennifer Crisp, M.D., at the Chest Pain Center for complaints of chest pressure, weakness, and fatigue. (AR 357). Vian had undergone an AVNRT ablation a year earlier. (AR 359). Her mood and affect were normal, and a pulmonary exam was unremarkable. (AR 358). Her lungs were clear to auscultation with good breath sounds bilaterally. (AR 358). Dr. Crisp did not think Vian's chest pain was cardiac in origin, and she encouraged Vian to talk with her family doctor about anxiety. (AR 359).

From December 2010 to November 2011, Vian was seen by doctors at Baptist Medical Associates for a variety of complaints, including wheezing, chest congestion, chest pain, body aches, headaches, neck pain, swollen glands, low back pain, rib pain, headaches, panic, and cough. (AR 378-90). In August 2011, a pulmonary function test showed a moderate obstructive ventilary defect with normal pulmonary diffusion capacity, which was consistent with obstructive pulmonary disease with improvement following bronchodilators. (AR 401-02). An MRI of the thoracic spine in November 2011 showed no acute abnormality, but very mild levoscoliotic curvature of the thoracic spine and some other minimal abnormalities. (AR 391). A chest X-ray was stable with mild emphysematous change. (AR 392).

Vian visited the emergency room in June 2011 for complaints of chest pain. (AR 363). The following month, she was hospitalized for two days with nausea and vomiting. (AR 374).

In December 2011, Vian saw Christopher Nelson, M.D., at Bluegrass Pain Consultants

for a five-week history of left upper thoracic pain. (AR 439-41). An MRI showed a stable and active nodule in the upper right lobe, atheromatous disease of the thoracic aorta, and blebs in the upper lobes. (AR 439). He diagnosed Vian with thoracic degenerative disc disease and thoracic spine pain, and he prescribed Percocet. (AR 440). The following month, Vian told Dr. Nelson that she obtained 50% pain relief for up to four hours after taking Percocet. (AR 437-38). Dr. Nelson completed short-term disability forms, stating that Vian should remain off work pending neurosurgery evaluation. (AR 438). In February 2012, Vian asked Dr. Nelson to lower her Percocet dose because she hoped to return to work in the next month. (AR 483-84). She stated that smoking significantly increases her pain. (AR 483-84).

Vian saw a physician's assistant at Norton Neuroscience Institute in February 2012 for complaints of thoracic pain following acute bronchitis. (AR 445-46). The pain was constant, but it lessened in intensity with Percocet. (AR 445). A review of systems was positive for fatigue, sinus headaches, shortness of breath due to emphysema, and urinary frequency. (AR 445). On physical exam, Vian's thoracic paraspinal muscles were tender to palpation, and she had a mild kyphotic deformity. (AR 446).

In late February 2012, Vian returned to Dr. Nelson, complaining of left upper thoracic pain. (AR 481-82). The pain worsened with activity and improved with medication and rest. (AR 481). Vian had used a 30-day prescription of Percocet in just 15 days without contacting Dr. Nelson's office; Dr. Nelson stressed the importance of taking medications only as directed. (AR 481). Vian asked to be released to return to work, and Dr. Nelson did so. (AR 482).

In March 2012, Vian saw Josephine Mei, M.D., a pulmonary specialist, for a several-month history of occasional stabbing chest pain. (AR 461). The pain was relieved with

medications and by lying or sitting down. (AR 461). Vian had shortness of breath on a daily basis; wheezing, which worsened at night; and an occasional cough. (AR 461). On exam, Vian had an expiratory wheeze which was diffusely diminished. (AR 462). Dr. Mei concluded that the pain was not related to blebs, but that she was at risk for spontaneous pneumothorax. (AR 463). Dr. Mei ordered a CT scan, reviewed Vian's medications, and recommended smoking cessation. (AR 463).

In April 2012, Vian saw Kimathi Ross, M.D., for continued left thoracic pain. (AR 465). Vian appeared extremely uncomfortable and had difficulty holding her neck steady. (AR 465). Her cranial nerves were intact, she ambulated well, and she had good strength and tone in her extremities; she had limited range of motion of her cervical spine and pain upon palpation in her thoracic spine. (AR 465). Dr. Doss ordered an MRI of the cervical spine. (AR 465). Later in April, Vian reported to Dr. Nelson an additional 10 to 20% reduction in her pain since her Percocet dosage was increased. (AR 479-80). Dr. Nelson continued Vian's Percocet. (AR 480).

Also in April 2012, Vian was examined by Peter Urda, D.O., for purposes of her disability application. (AR 448-51). She told Dr. Urda that she had difficulty standing and sitting for long periods of time. (AR 448). On physical examination, Vian's grip and extremity strength were 5/5, and her gait and station were normal; she could stand, squat, and tandem walk. (AR 449). X-rays of her cervical spine revealed moderate to severe degenerative disc disease at C4 to C7. (AR 451). Dr. Urda assessed:

> [Vian] is capable of hearing, seeing and speaking. She is capable of standing, sitting, and walking. She has limited ability to walk long distances and stand for long periods of time without sleeping or rest breaks. . . . She has limited ability to constantly bend and twist at the waist while carrying, pushing, pulling, or lifting weights.

(AR 451).

In May 2012, Vian returned to Dr. Mei for a follow-up on her pulmonary problems. (AR 455-57). Vian reported that her shortness of breath had worsened since her last visit and that she wheezes occasionally. (AR 455). She continued to smoke and had not stayed on the prescribed inhalers, other than the samples provided, due to insurance issues. (AR 455). Dr. Mei stressed smoking cessation and referred Vian for a stress test. (AR 457).

Later in May 2012, Vian saw Dr. Doss for a follow-up on the MRI. (AR 466). Vian reported severe neck pain, together with numbness and tingling down her upper extremities to her wrist, left greater than right, which had been progressively worsening. (AR 466). An MRI showed marked stenosis at the C5-6 level with severe disk osteophyte complex, loss of disk height, and slight kyphotic deformity. (AR 466). She also had some mild lateral recess foraminal stenosis at the left C3-4. (AR 466).

In late May 2012, Dr. Nelson administered several C5-C6 epidural injections to Vian. (AR 474-77). He noted that she had been seen for a surgical evaluation for her pain in the cervicothoracic junction that had failed to improve with conservative measures. (AR 476). In mid-June 2012, Dr. Doss completed a form for Vian's employer, indicating that she was scheduled for cervical fusion surgery on July 2, 2012, and would be off work through the end of August 2012. (AR 527).

Also in June, Vian returned to Dr. Nelson for her complaints of axial neck pain extending to the upper thoracic region, left greater than right. (AR 472-73). Vian reported that her pain worsens with activity and when using her arms, particularly while working as a cashier. (AR 472). Dr. Nelson indicated that Vian's pain had decreased by 85% after the injections, but then

gradually returned; Percocet, however, reduced Vian's pain by 40 to 50%. (AR 472). Vian rated her pain as a "four," indicating that it increased to as high as "six" at times. (AR 472). Dr. Nelson wrote that Vian had been seen for a surgical evaluation and that she planned to undergo cervical fusion surgery, but in light of the progressive worsening of her symptoms, he recommended that she continue injection therapy in the interim. (AR 473). A week later, Vian underwent an epidural steroid injection at C5-6. (AR 471).

Vian's surgery that was scheduled for July 2, 2012, ultimately never occurred "due to a series of unfortunate circumstances stemming from [Vian's] abuse of Percocet." (AR 588; *see also* AR 571). Vian lost her job at Meijer in July 2012, where she had worked for four and a half years, as a result of poor attendance due to her pain and abuse of Percocet. (AR 588). Vian and her boyfriend were evicted from their apartment in Louisville, and her boyfriend was hospitalized with a chronic lung disease. (AR 588).

In August 2012, Vian was admitted to Grant Blackford Mental Health. (AR 571-79). She had moved to Marion from Louisville two weeks earlier to be near family, receive financial support, and have a place to stay; her boyfriend was still hospitalized in Louisville. (AR 571). Vian had been taking six Percocet a day for the past year, but had not had any in three weeks and was experiencing withdrawal. (AR 571). She had a 10-year history of methamphetamine use, but had stopped using in 2006. (AR 572). Upon admission, Vian stated that she could not tolerate the Percocet withdrawal or the pain, and she was having suicidal thoughts. (AR 571). She endorsed symptoms of depression in the past three months, together with disturbed sleep, feelings of worthlessness and guilt, suicidal ideation, and anergia. (AR 571). She thought that her recent symptoms of depression occurred only after she began abusing Percocet. (AR 588).

On mental status exam, Vian's mood and affect were anxious, her judgment was moderately impaired, and her insight was impaired. (AR 577). Her attention and concentration were intact, and her thought process was logical and goal-directed. (AR 577). She demonstrated little improvement in insight and coping skills during her stay; she showed poor insight regarding her issues with chemical dependence. (AR 578). Although she progressed sufficiently to be discharged, she continued to exhibit dependent personality characteristics and medication-seeking behaviors. (AR 578). A follow-up visit with outpatient services was recommended. (AR 578).

On September 26, 2012, J. Sands, M.D., a state agency physician, reviewed Vian's record and affirmed the opinion of Theresa Alberson, a single decision maker for the Social Security Administration, who assessed that Vian could lift 10 pounds frequently and 20 pounds occasionally; stand or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently stoop, kneel, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; must avoid concentrated exposure to humidity and hazards; and must avoid even moderate exposure to vibration, fumes, odors, gases, and poor ventilation. (AR 148-50, 181).

In September and October 2012, Vian was seen for medication management at Grant Blackford Mental Health by Donna Spears, an advanced practice nurse, or one of her colleagues. (AR 509-15, 560-61). Vian stated that she needed more Neurontin because she was taking 600 mg three times a day, which was more than prescribed and most effective in managing her pain. (AR 514). She denied abusing pain medications and refused addiction services. (AR 509). On mental status exam, she was restless, fidgeting, intense, anxious, depressed, circumstantial, and

tangential; she demonstrated adequate judgment, fair insight, and intact attention and

concentration. (AR 510). She was assigned a current Global Assessment of Functioning

("GAF") score of 45.[3] (AR 511). In November 2012, Vian's Neurontin was increased, at her

request, to four times a day. (AR 505-06). That same month, Vian presented at the emergency

room due to breathing difficulties, and she was admitted for an exacerbation of COPD. (AR

537-39, 547-48). Vian told the doctor that she had various inhalers but that she "hardly" used

them. (AR 545).

In December 2012, Vian returned to see Ms. Spears, reporting that the increased dosage

of Neurontin was very helpful in that she was experiencing less pain and was sleeping better.

(AR 498-502). On mental status exam, Vian was restless, fidgeting, anxious, intense, depressed,

circumstantial, obsessive, and pessimistic; her attention and concentration was impaired. (AR

499). She demonstrated adequate judgment and fair insight; she had no suicidal thoughts. (AR

499). Her current GAF was still 45. (AR 499).

On February 5, 2013, Ms. Spears completed a document sent from Vian's attorney. (AR

486-87). Ms. Spears indicated that Vian had loss of interest in activities, decreased energy,

feelings of worthlessness, difficulty concentrating, and suicidal thoughts. (AR 486). Ms. Spears

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am.
Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score
of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any
serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF
score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or
moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-
workers). *Id.*
     "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-
1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical
Manual of Mental Disorders* 16 (5th ed. 2013)). However, some medical personnel of record used GAF scores in
assessing Vian, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th
Cir. 2013)).

opined that such symptoms resulted in a marked restriction of daily living activities; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation of extended duration. (AR 486). In her narrative, Ms. Spears wrote that Vian easily panics and becomes overwhelmed, has very few coping mechanisms, and requires frequent and lengthy redirection. (AR 487).

Ms. Spears also saw Vian in February and March 2013 for medication refills. (AR 494-97). At her March visit, Vian reported that she had been "real depressed" since her last visit, identifying the main contributing factors as her unsanitary living conditions and the persistent pain in her lungs and back. (AR 491). She stated that she was experiencing suicidal ideation once a week. (AR 490-91). Ms. Spears noted on her Axis IV diagnosis that Vian had significant problems in concentrating, thinking through issues, and decision making; that she had a high level of anxiety; and that she was "disabled in multiple life domains by [her] depression." (AR 491). Ms. Spears assigned Vian a current GAF of 50. (AR 491).

In March and April 2013, Vian was seen at Bridges to Health for an evaluation. (AR 517-20). On exam, she was very anxious and rocking back and forth. (AR 517). The examiner advised Vian that she would need to be placed on an antidepressant that had analgesic features. (AR 517). Vian was unhappy with the plan of care and stated she wanted to see another provider; she was scheduled for another evaluation the next week. (AR 517).

On July 15, 2013, Sandra Shaw, a case manager, completed a mental impairment questionnaire on Vian's behalf, which was cosigned by Ms. Spears. (AR 614-19). They indicated that Vian was seen every three months for 15 minutes. (AR 614). Vian's signs and symptoms were identified as poor memory, mood disturbance, emotional lability, social

isolation, decreased energy, panic attacks, loss of interests, paranoia, feelings of worthlessness, difficulty thinking or concentrating, suicidal ideation, persistent irrational fears, hostility, irritability, and pathological dependence. (AR 614-15). They represented that Vian had not improved much through treatment and that her depression and anxiety exacerbated her physical conditions. (AR 615). Vian was assigned the following prognosis: "[S]he may be able to maintain a stress free lifestyle fairly well on medications; more than likely she will continue to struggle indefinitely." (AR 616). They estimated that Vian's impairments would cause her to be absent from work more than three times a month. (AR 617).

As to the necessary mental abilities for unskilled work, the questionnaire reflected that Vian's ability was "Poor or None" in the following categories: maintain attention for two hours, maintain regular attendance, sustain an ordinary routine without supervision, work in coordination with or proximity to others, make simple work-related decisions, complete a normal workday and workweek, perform at a consistent pace, accept instructions and criticism from supervisors, get along with co-workers or peers, respond appropriately to changes in a routine work setting, and deal with normal work stress. (AR 617). The questionnaire further indicated that Vian had a "Fair" ability to remember work-like procedures, carry out simple instructions, ask simple questions, be aware of normal hazards, interact appropriately with the public, and maintain socially appropriate behavior; and a "Good" ability to understand and remember very short and simple instructions. (AR 617). Vian's ability with respect to performing semi-skilled or skilled work, adhering to basic standards of cleanliness, traveling in unfamiliar places, and using public transportation was "Poor or None." (AR 618). In sum, the questionnaire reflected that Vian had marked limitations in restrictions of daily living activities; moderate difficulties in

13

social functioning; frequent deficiencies in concentration, persistence, or pace; and three or more episodes of decompensation. (AR 619).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

### IV. ANALYSIS

#### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence:  (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4]  *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.* (citation omitted).  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Clifford*, 227 F.3d at 868 (citation omitted).

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. §§ 404.1520(e), 416.920(e).

## B. The Commissioner's Final Decision

On October 25, 2013, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 21-34). At step one of the five-step analysis, the ALJ found that Vian had worked after her alleged onset date but that the work did not rise to the level of substantial gainful activity. (AR 23). At step two, the ALJ found that Vian had the following severe impairments: degenerative disc disease of the cervical spine (C4, C5, C6, and C7); breathing problems associated with COPD, emphysema, and blebs; depression; anxiety; amphetamine use; and opioid dependence. (AR 24). At step three, the ALJ concluded that Vian did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 24).

Before proceeding to step four, the ALJ determined that Vian's symptom testimony was not credible, and the ALJ assigned her the following RFC:

> [T]he claimant has the [RFC] to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 6 hours per 8-hour workday, and sit for 6 hours per 8-hour workday with normal breaks. She can never climb ladders, ropes, scaffolds, ramps or stairs, but can occasionally balance, stoop, crouch, kneel, and crawl. She must avoid concentrated exposure to extreme cold, extreme heat, and wetness and humidity; avoid even moderate exposure to excessive vibration, pulmonary irritants such as fumes, odors, dust and gases, poorly ventilated areas, and chemicals; and avoid concentrated exposure to the use of hazardous machinery and work at unprotected heights. The claimant is limited to simple (SVP 1 or 2), routine, and repetitive tasks; to a low stress job with only occasional decision[-]making required, with only occasional changes in the work setting, and to work with no production rate or pace work.

(AR 26).

At step four, based on the RFC and the VE's testimony, the ALJ concluded that Vian could perform her past relevant work as a gas station cashier as it is generally performed and as she actually performed it. (AR 32). Additionally, at step five the ALJ found that Vian could

perform a limited range of light work jobs, including retail marker, cafeteria attendant, and hand

packager. (AR 33). Therefore, Vian's applications for DIB and SSI were denied. (AR 33-34).

*C. The ALJ's Consideration of Ms. Spears's Opinion and the Mental RFC Will Be Remanded*

Vian first argues that the ALJ improperly evaluated and discounted the opinions of Ms.

Spears, a treating advanced practice nurse, leaving the mental RFC without the support of

substantial evidence. For the following reasons, the ALJ's consideration of the mental health

limitations opined by Ms. Spears and the resulting mental RFC require a remand of this case.

The opinion of an advanced practice nurse is considered an "other source" under the

Social Security regulations, rather than an "acceptable medical source." *See Turner v. Astrue*,

390 F. App'x 581, 586 (7th Cir. 2010); *Stewart v. Colvin*, No. 14-cv-1361, 2016 WL 81779, at

*7 (C.D. Ill. Jan. 7, 2016); *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1055 (E.D. Wis. 2005); 20

C.F.R. §§ 404.1513(d), 416.913(d); SSR 06-03p, 2006 WL 2329939, at *1-2 (Aug. 9, 2006).

Although information from an "other source" cannot establish the existence of a medically

determinable impairment, it may be used "to show the severity of the individual's impairment(s)

and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *2

(Aug. 9, 2006); *see Koschnitzke v. Barnhart*, 293 F. Supp. 2d 943, 950 (E.D. Wis. 2003).

"[T]he adjudicator generally should explain the weight given to opinions from these

'other sources,' . . . when such opinions may have an effect on the outcome of the case." SSR

06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006); *see Masch*, 406 F. Supp. 2d at 1055 (stating

that opinions from "other sources" must not be ignored). The fact that an advanced practice

nurse is an "other source" under the regulations "says nothing in itself as to why [her opinion is]

only entitled to little weight." *Hampton v. Colvin*, No. 12 C 9300, 2013 WL 6577933, at *6

(N.D. Ill. Dec. 13, 2013) (remanding the case based on the ALJ's reasoning with respect to the nurse practitioners' opinions, recognizing that the role they played took on special significance because they provided a very large proportion of the claimant's care). "[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." SSR 06-03p, 2006 WL 2329939, at *4 (Aug. 9, 2006). "As SSR 06-03p recognizes, the growing importance of managed care means that nurse practitioners play an increasingly large role in treating patients who would otherwise be seen by physicians or other acceptable medical sources." *Hampton*, 2013 WL 6577933, at *6.

Here, Ms. Spears issued two opinions, the first in February 2013 and the second in July 2013.[5] In February 2013, Ms. Spears found a number of specific limitations, including that Vian would miss work more than three times a month due to her impairments. (AR 614-19). In July 2013, Ms. Spears opined that Vian constantly struggles with being overwhelmed, panics easily, and requires frequent and lengthy redirection, and that she had a marked restriction in activities of daily living; marked difficulties in maintaining concentration, persistence, or pace; and repeated episodes of decompensation, each of extended duration. (AR 486-87).

The ALJ considered Ms. Spears's opinions, but concluded that Vian's mental health records did not support the limitations set forth therein, noting that Ms. Spears's own records reflect that Vian found her psychotropic medication and therapy helpful. (AR 31; *see* AR 509).

---

[5] The February 2013 opinion was completed by Ms. Shaw, a case manager, and cosigned by Ms. Spears. (AR 31, 619).

The ALJ further articulated that the records do not support a finding that Vian had any marked limitations, that any hospitalizations for mental symptoms were extended in duration, or that she would miss three or more days of work a month. (AR 31). The ALJ additionally stated that the GAF scores of 45 to 50 assigned by Ms. Spears were consistent with moderate to serious limitations, rather than marked limitations and an inability to work. (AR 31). The ALJ ultimately assigned "little weight" to Ms. Spears's opinions. (AR 31).

Vian takes issue with the ALJ's allocation of little weight to Ms. Spears's opinions. Vian points out, and correctly so, that Ms. Spears was the only medical professional of record to offer an opinion about her mental functioning, as the Social Security Administration did not order any consultative mental examinations, and no state agency psychologist or medical expert reviewed the record and issued an opinion. Vian argues that, as the only mental health opinions of record, Ms. Spears's opinions are entitled to great weight.

Contrary to Vian's assertion, "[t]he administrative law judge is not required or indeed permitted to accept medical evidence if it is refuted by other evidence—*which need not itself be medical in nature . . . .*" *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009) (alteration in original) (quoting *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995)). Thus, the ALJ is not required to adopt an opinion of a medical professional solely on the basis that it is the only opinion of record. Having said that, there are other problems with the ALJ's consideration of Ms. Spears's opinions and the crafting of the mental RFC that necessitate a remand.

To explain, "an ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so." *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (citations omitted). That is, an ALJ may not make independent medical findings about whether

certain activities are inconsistent with a particular medical diagnosis. *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996). Here, the ALJ inappropriately "played doctor" after discounting Ms. Spears's opinions. More specifically, after discounting Ms. Spears's opinions, the ALJ concluded that Vian's mental impairments were "somewhat situational and based on pain and lack of sleep." (AR 30). The ALJ, however, does not cite to any medical source of record in support of this conclusion, and thus, her lay conclusion lacks support. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("No doctor concluded that Larson's symptoms were just a response to situational stressors as opposed to evidence of depression. The ALJ's conclusion to the contrary thus finds no support in the record.").

"When an ALJ denies benefits, [s]he must build an 'accurate and logical bridge from the evidence to [her] conclusion,' and [s]he must may not 'play doctor' by using [her] own lay opinions to fill evidentiary gaps in the record." *Chase v. Astrue*, 458 F. App'x 553, 556-57 (7th Cir. 2012) (citations omitted). "It is the ALJ's responsibility to recognize the need for further medical evaluations of a claimant's conditions before making RFC and disability determinations." *Id.* (citations omitted). After rejecting Ms. Spears's opinions, the ALJ should have sought an additional evaluation of Vian's mental condition, rather than fabricate a mental RFC out of whole cloth. *See Betts v. Colvin*, No. 13-cv-6540, 2016 WL 1569414, at *3 (N.D. Ill. Apr. 19, 2016) (remanding the ALJ's decision where the ALJ failed to articulate which medical records provided support for the assigned RFC, leaving the court to guess where there was support for the RFC in the medical records or whether the ALJ "fabricated [the RFC] out of whole cloth").

Although the ALJ attempted to give Vian "the benefit of the doubt" by incorporating

certain mental limitations in the RFC (AR 30), there is *no* medical opinion of record supporting these limitations, as Vian's record was never reviewed by a state agency doctor. Moreover, the ALJ completely rejected Ms. Spears's opinion that Vian would miss more than three days of a work a month due to her impairments. (AR 617). However, as the Seventh Circuit Court of Appeals has emphasized, "a person who suffers from mental illness will have better days and worse days." *Punzio v. Astrue*, 630 F.3d 704, 711 (7th Cir. 2011) (citations omitted). "[A]n ALJ cannot rely solely on the claimant's or doctor's hopeful remarks made during better days, but must consider whether the claimant can hold a job even on low days." *Johnson v. Astrue*, No. 11 CV 6668, 2012 WL 5989284, at *11 (N.D. Ill. Nov. 29, 2012) (citing *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)). Here, there is no medical professional of record disputing Ms. Spears's opinion concerning Vian's expected absenteeism. In fact, Vian lost her jobs at Meijer and Walmart for missing too many days due to, at least in part, a combination of her mental and physical impairments, lending support for Ms. Spears's opinion concerning absenteeism. (AR 47, 49, 90-91); *see Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) (remanding the ALJ's decision based, in part, on the claimant's history of absenteeism and because no medical provider opined that the claimant could hold down a full-time position).

In sum, after the ALJ discounted Ms. Spears's opinions, which were the only opinions of record concerning Vian's mental limitations, the ALJ improperly "played doctor" by interpreting medical findings and concluding that Vian's mental impairments were "somewhat situational and based on pain and lack of sleep." (AR 30). The ALJ then fabricated a mental RFC out of whole cloth, leaving the ALJ's decision without the support of substantial evidence. Consequently, the ALJ's decision will be remanded for further development of the medical record with respect to Vian's mental impairments and for reevaluation of Ms. Spears's opinions

and the mental RFC.[6]

### D. The ALJ Should Also Revisit Her Flawed Credibility Determination Upon Remand

Vian also asserts that the ALJ improperly discounted the credibility of her symptom testimony. The Court agrees that there are several material flaws in the ALJ's credibility determination, particularly with respect to Vian's complaints of neck and back pain, which the ALJ should address upon remand.

First, the ALJ discounted the credibility of Vian's complaints of disabling neck and back pain based, in part, on the objective medical evidence and that she had undergone only conservative treatment. With respect to the objective medical evidence, the ALJ emphasized that on physical exam, Vian's grip strength, extremity strength, gait, and station were all normal, and she was able to stand, squat, and tandem walk. (AR 28; *see* AR 449, 465). As to the treatment that Vian had undergone, the ALJ articulated: "Despite her allegations of severe neck

---

[6] Vian also challenges the ALJ's statement that the GAF scores of 45 to 50 assigned by Ms. Spears were indicative of moderate to serious findings, rather than marked limitations and an inability to do work. (AR 31). Vian emphasizes that GAF scores do not have a direct correlation to the severity requirements of the listings for mental disorders, and thus, that the ALJ was incorrect when she stated these GAF scores were inconsistent with Ms. Spears's opinion of marked limitations. Vian's argument has some merit as the Seventh Circuit has remarked on at least one occasion: "A GAF rating of 50 does not represent functioning within normal limits. Nor does it support a conclusion that [a claimant] was mentally capable of sustaining work." *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010).

Having said that, while a GAF score is "useful for planning treatment," *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (quoting Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* ("DSM-IV") 32-34 (4th ed. 2000)), because it is a measure "of both severity of symptoms *and* functional level . . . [and] 'always reflects the worse of the two,' the score does not reflect the clinician's opinion of functional capacity." *Id.* (quoting DSM–IV at 33); *see Curry v. Astrue*, No. 3:09-cv-565, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2, 2010) ("GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability." (citation omitted)); *Martinez v. Astrue*, No. 9 C 3051, 2010 WL 1292491, at *9 (N.D. Ill. Mar. 29, 2010) ("GAF scores are intended to be used to make treatment decisions, . . . not as a measure of the extent of an individual's disability." (alteration in original) (citation and internal quotation marks omitted)). "Accordingly, nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on [her] GAF score." *Denton*, 596 F.3d at 425 (citation and internal quotation marks omitted); *see Adams v. Astrue*, No. 1:06-cv-393, 2009 WL 1404675, at *4 (N.D. Ind. May 18, 2009) ("Social Security regulations don't require an ALJ to determine the extent of an individual's disability based solely on a GAF score, but the scores may assist in formulating the claimant's [RFC]." (citation omitted)).

pain, [Vian] continues to seek only conservative treatment, suggesting that her neck pain is not as severe as alleged."  (AR 29).

Vian's neck and back complaints, however, were centered on disabling *pain*, not muscle weakness or motor deficits.  (*See* AR 49, 53-54).  X-rays showed moderate to severe degenerative disk disease at C4 through C7, and an MRI showed marked stenosis at the C5-6 level.  (AR 451, 466).  Vian's surgeon scheduled her to undergo cervical fusion surgery in July 2012.  (AR 527).  The record is replete with evidence that Vian was taking Percocet at high doses (when she could afford to do so) in an effort to control her pain.  (*See, e.g.*, AR 437, 445, 472, 479, 481, 571).  The Seventh Circuit has acknowledged that a claimant's taking "heavy doses of  strong drugs" indicates that a claimant's complaints of pain are likely credible.  *Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014) (citing *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)).  Furthermore, the fact that physicians willingly prescribed Vian medications and scheduled her to undergo cervical fusion surgery indicated that they believed Vian's symptoms were real.  *See id*.

Second, the ALJ seized on Vian's purportedly inconsistent reasons for cancelling her July 2012 cervical fusion surgery (AR 27, 29, 31), but failed to ask Vian in accordance with SSR 96-7p why she did not undergo the cervical fusion surgery after she had stopped abusing Percocet and her life circumstances had improved.  An ALJ must not draw inferences about a claimant's symptoms and their functional effects from a failure to seek treatment without first considering any explanations that the individual may provide.  *See* 96-7p, 1996 WL 374816, at *7-8 (July 2, 1996); *see also Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008).  "Good reasons" for failing to seek treatment may include "an inability to afford treatment," *Shauger v. Astrue*,

675 F.3d 690, 696 (7th Cir. 2012) (citation omitted); *see Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (articulating that an inability to afford treatment is a reasonable explanation for failing to complete prescribed medical treatment), and it is quite evident from the record that Vian had financial struggles (*see, e.g.*, AR 49, 53, 55, 58, 71, 73, 85, 455, 588).

Third, Vian argues that the ALJ unfairly discounted her credibility for continuing to smoke against her doctor's advice. On that front, the Seventh Circuit has stated: "Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health[,]" making it "an unreliable basis on which to rest a credibility determination." *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000); *see Jones v. Astrue*, No. 2:12-cv-143, 2013 WL 816170, at *13 (N.D. Ind. Mar. 4, 2013) ("[A] plaintiff's failure to quit smoking after being advised to do so should generally not serve as the basis for an ALJ's credibility determination."). Vian successfully cut back her smoking from one pack a day to four cigarettes a day. (AR 67, 88). As such, the Court agrees that Vian's continued smoking does not serve as a reliable basis upon which to discount her credibility.

Finally, the ALJ viewed that Vian's daily activities—in particular, her ability to serve as the sole caregiver for her boyfriend on a daily basis and her ability to shop for groceries, cook, and do dishes—undercut her testimony of disabling limitations. (AR 25, 55-56, 123-24, 509). But Vian's daily activities are not inconsistent with her testimony of the need for intermittent breaks during the day due to her neck and back pain (AR 56, 66, 79, 90), as there likely are significant periods of time during the day in which she can rest in between caring for her boyfriend's needs. *See Engstrand v. Colvin*, 788 F.3d 655, 661 (7th Cir. 2015) (remanding credibility determination, finding that the claimant's "reported activities were quite consistent

with his testimony that he cannot stand for very long without pain and that he needs to frequently alternate between sitting, standing, and lying down"); *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014) (stating that ALJs must recognize that "full-time work does not allow for the flexibility to work around periods of incapacitation").  "Sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity."  *Scrogham*, 765 F.3d at 700 (alteration in original) (citation omitted).

Furthermore, with respect to Vian's caring for her boyfriend full time, "[a] person can be totally disabled for purposes of entitlement to social security benefits even if, because of an indulgent employer or circumstances of desperation, [s]he is in fact working."  *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (citations omitted) ("Gentle *must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts.").  Moreover, Vian testified that she had significant difficulty maintaining her personal hygiene and performing household tasks in that she had not bathed for six weeks, had not cleaned her apartment since moving in, and had not done laundry in seven months.  (AR 87, 91-92).  As such, the ALJ failed to explain how Vian's daily living activities, which appear quite minimal in nature, are inconsistent with her complaints of disabling neck and back pain.  *See Ramey v. Astrue*, 319 F. App'x 426, 430 (7th Cir. 2009) (opining that the claimant's minimal daily activities, which included two hours of house chores punctuated with rest, cooking simple meals, and grocery shopping three times a month, were not inconsistent with her claims of disabling pain); *Zurawski*, 245 F.3d at 887 (same).

Because these material flaws undercut the ALJ's credibility determination, the ALJ should reassess Vian's credibility on remand, particularly with respect to her complaints of

disabling neck and back pain.[7] *See Clifford*, 227 F.3d at 872 (emphasizing that the ALJ "must build an accurate and logical bridge from the evidence to [her] conclusion" (citations omitted)).

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion and Order. The Clerk is directed to enter a judgment in favor of Vian and against the Commissioner.

SO ORDERED.

Entered this 2nd day of February 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge

---

[7] Because the Court is remanding this case based on Vian's first argument concerning the ALJ's consideration of Ms. Spears's opinions and the crafting of the mental RFC, the Court need not reach Vian's remaining arguments.